The first case this morning is case number 514140080 and it's, I guess, Zylem Dewatering versus, man you got me on that one, I'll let you pronounce your client's name, Szablewski. Ready for safety? Szablewski. Ok, got me, let's go. May it please the court, good morning, your honors, I am Carrie Kinsella with Jackson Lewis Law Firm and along with lead counsel Rob Fischer, I'm here on behalf of the appellants. Mr. Fischer will be doing the majority of the argument today in this case, but with leave of court I may assist with any questions the court may have. I would also like to note that corporate counsel for the appellants, Mr. Tim Glaser, is present in the courtroom today as well. And with the court's permission I will now turn it over to my lead counsel, Mr. Fischer. May it please the court, good morning, as Ms. Kinsella said I'm A. Robert Fischer of Heartland Pumps of America, which is the parent company of the other plaintiff, Heartland Pump Rental and Sales, Inc. We're here today because the plaintiffs challenged some misconduct by Mr. Szablewski and Mr. of their business, CNC Pumps and Supply, after they left Heartland. We put on significant evidence at a preliminary injunction hearing of misconduct, admitted misconduct, evidence of real harm, the loss of suppliers, customers, and goodwill. We felt we had more than satisfied our burden and we were more than surprised when we read the decision, basically just saying no, no, no, no explanation, no reasoned decision at all, just no. We believe that the trial court's decision to deny the preliminary injunction was an abuse of discretion given the admitted misconduct in this case. And it's interesting in this case, Your Honors, that the defendants, while it took a little doing at times, pretty much conceded there was conduct. Their argument, though, twists things to a point of real, very disingenuous effort to explain certain things based on others. For example, they'll say, well, they went to a trainer whose job it was to train them how to rent pumps, and the trainer said you should really focus on renting pumps. And then the argument is that meant that Heartland was going out of its traditional business. This is a business that does rent pumps. They also sell pumps. But Heartland especially, as opposed to many of the other Godwin companies, is very involved in the mine supply business, which is important in this case. So they sell and service various piping products and other mine service things so that the mine customers are very concerned about whether Heartland would, in fact, perform its traditional role that the defendants told them that Heartland would not do that. But they would, and that Heartland was somehow going out of business. And they have, again, while the defendants have been relatively candid about what they've done, the argument is, well, because they were once told that they should focus on renting that Heartland was changing its business model. So beginning about ten weeks before they resigned from Heartland, the defendants told the suppliers who were critical of the business, these are suppliers who basically make pumps that they use and sell, that Heartland would no longer distribute their products. And they did that in an effort to get the suppliers to support their new business. Also well before, and they left in July, these conversations occurred back in May. Also well before leaving Heartland, Nestor Cebulski and Ralphs told Heartland customers who were critical to its business, these are large customers for the most part, the lie that Heartland was abandoning its traditional business model, which focused largely on these pumps and related piping equipment and other mine support services. So they're going out of business, but we'll support you. We're going to still be in this business. And the purpose of that lie was obviously to move business from those customers to C&C. They also employed former Heartland employees in violation of a contract that Mr. Cebulski had with Heartland. The result of that was that C&C basically took Heartland's business. They didn't buy it. They didn't, you know, take over a business that had closed. They were well-employed for Heartland on moving this business over to another operation, and then they jumped out of the Heartland business and started running the operation. Three days after they joined, or after they left Heartland, Stanford, a significant pump supplier, stopped its relationship with Heartland and started supplying pumps to C&C. This was an extraordinary and admitted effort to misappropriate this business. C&C distributes pumps previously distributed by Heartland only. It sells solely to customers that Mr. Cebulski and Ralphs worked with while at Heartland. And 10 of its 13 employees previously worked for Heartland. So in addition to lying about Heartland to benefit C&C, C&C produced in discovery a variety of documents that C&C and its employees had no right to possess, including pricing and customer contact information. And again, during the hearing, when I would ask questions like, you would admit you're not supposed to have this, right? Right. No. Well, wouldn't that be redundant, though? If they have their customers, they know who their customers are. Yes, Your Honor, but they don't have all the pricing information. Really, do they? They don't have all the pricing information. And they know all that, right? They don't know all of it. Some of it's relatively complicated. As far as knowing all the customers, though. Oh, they know all the customers. Absolutely, Your Honor. But this is not exclusively a trade secret case. This is a combination of wrong case. But again, when they were asked under oath, you knew you weren't supposed to have this, right? They would admit, yeah, we're not supposed to have it. And you should give that back. Right, right. And it was wrong to tell these customers that Heartland was going out of this business, wasn't it? Yeah. And that should probably be corrected, shouldn't it? Yeah. And it was wrong. I mean, over and over again, they admitted the misconduct. So the plaintiffs are working to develop further evidence and plaintiff present their damage claims at trial. But until then, an injunction is necessary to stop the ongoing harm. The plaintiffs have established a clearly ascertainable right to protection, including customer and supplier relationships, business reputation, employee relationships, and this pricing information. In an adequate remedy of law, this has a significant impact on their business. Through the loss of customers, suppliers, and employees, the long-term impact is unknown and damages will be difficult to calculate. They've established a likelihood of success on the merits on at least some of their claims. And an injunction is simply appropriate here. It's the appropriate remedy to stop this kind of loss as a result of this kind of breach. I'm going to go through a few of them. I know this is an unusual process on appeal when you've got an injunction issue. But to show an abuse of discretion, we really have to show the facts. In mid-May, during the employment with Heartland, Ralph started talking to customers about his new competing company with the intention of determining whether the customers would support his new venture. These are admissions. Ralph's made statements to representatives of Nighthawk Coal, Pine Pump Sand and Gravel, and Lafarge Three Rivers Quarry that Heartland was going out of the full-service business and focusing on pump rentals. Ralph's told these customers that his new competing business, C&C Pumps, would provide that full-service work that Sabluski told customers that Heartland was going in a different direction from C&C Pumps and that C&C would service the mines in a manner that Heartland had. Sabluski also had a conversation with a representative of American Coal and a representative of White Oak Resources. Sabluski admitted that other people acting on behalf of C&C Pumps, of these were his employees, told customers that Heartland was going out of the full-service business and that it was wrong to make such statements. Heartland lost the entire American Coal account. Sabluski had worked with Sugar Camp Energy on a Route 14 project while employed at Heartland and bid on the same work on behalf of C&C Pumps. Heartland lost the Sugar Camp project to C&C Pumps. In addition to misrepresentations to customers, there were misrepresentations to suppliers. Again, these began as early as May 1st by Rolf's admissions to Stanpor and then Hydroflow sometime in May or June. Rolf told these suppliers that Heartland would be dropping them, that Heartland was getting out of the full-service business and focusing on Godwin Pump Rentals. Rolf submitted at the hearing that these statements he made, dropping suppliers, getting out of the full-service business, were not based on any information he had found in any document or anything that anybody at Heartland had told him. And he admits that these discussions were with the intent of determining whether these suppliers would support his competing company, C&C. They also solicited employees. Sabluski's, I'm sorry, with respect to the harm from this, Stanpor, again, three days after they resigned from Heartland, Stanpor moved to C&C. BJM Pumps canceled its long-term exclusive relationship with Heartland. And Hydroflow had previously an exclusive relationship with Heartland, and it's now using C&C. Of particular importance on these facts, Your Honors, is the Stanpor relationship. Because of an agreement that Godwin has with its suppliers, it cannot provide a competing pump to Stanpor in this area, in this part of the country. So the Stanpor line was crucial to fill a gap in its product line. At the time of the hearing, there were a few Stanpor pumps still in inventory at Heartland, but the uncontroverted testimony was that once those pumps were sold or out in the field, they had nothing else and they could not fill some of these bids that they had received for their products. They also solicited Heartland employees. Once Zbluski had a non-solicitation agreement, it was reasonable. Now, you'll probably hear from the defendants, athletes, that this agreement is not enforceable because he didn't work there for two years. That is a legal red herring. This is not a situation where the only consideration is the ability to the- Did they sign any restrictive covenants at that time? No, Your Honor. The only restrictive covenant to the extent that this one is this non-solicitation agreement, which says that if you leave, you're not allowed to solicit non-clerical employees, solicit or hire them for a year. But the consideration, the reason that the- how long he was employed under this agreement is a red herring, is the consideration was not just being allowed to work there. The consideration were definitive promises in that agreement that if he were terminated without cause or if he quit for a good reason, he would be paid a bonus. And if he continued to work and wasn't terminated and didn't quit and he was there when the bonus was paid, he would be paid a bonus. That was the consideration. And that's why it's different than the line of Illinois cases that talks about how long you have to be employed for non-compete to be enforceable. There was completely separate consideration for this. How many non-clerical were hired by the defendants? Including the two defendants, I believe there are seven of the nine. Yeah, sorry, five. Five were hired, depending on whether you believe Rolfs was hired by Cebulski, who had the non-solicit. So that many non-clerical. My question was how many non-clerical. Because they could hire clericals, I understood the agreement, but it was only non-clerical. That's correct. And as I understood it at the time of trial, there were 13 employees at C&C. Ten of them had previously worked at Harlan. Of those ten, in addition to the two defendants, five were non-clerical. So this is a business that was staffed by Harlan, that was supplied by Harlan suppliers, and that sold only to Harlan's customers. And this was just a lifting of that business away. And the damages were significant. They were doing, you know, over a million a month before this happened, and they were doing a third of that or so after this occurred. So the damage was very significant. Yeah, the testimony was the revenue was $1.2 to $1.5 million a month, and then it had dropped to about $500 to $600 a month after this happened. So we believe that we've raised with these facts more than a fair question. With respect to the fiduciary duty, there's no question they've reached the fiduciary duty, and they were not, as you will probably hear argued, just playing to compete. Arranging for a supplier, lying about your employer, arranging for customers, arranging to staff your business while you are still employed by Harlan is a violation of your duty to Harlan. It's an absolute violation of duty. It's not like, you know, preparing articles of incorporation or getting a license or finding space to do business. This was actively working against your employer's interest while you were being employed by your employer. So we believe we've clearly got a breach of fiduciary duty argument. With respect to Illinois Deceptive Trade Practices Act, they made false statements. Under the act, a deceptive trade practice disparages good services or business of another by false or misleading representation of fact or engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding. I don't know what could be – I don't know if they were confused. They were laboring under the false impression, not the confusion, but they were told, listen, these guys can't do this work anymore. We can. These guys aren't going to support these pumps anymore. We'll take them. That's not just confusion. That's a lie. That's a lie for the purpose of getting somebody to stop doing business with one company and start doing business with another, which is, by definition, a deceptive trade practice. We believe we've got liability there. Let me ask you this. I'm looking at Judge Smoot's order, and she just – she made a general finding that the plaintiff failed to prove inadequate remedies at law. Do you think your damages for lost business could be ascertained? Can they be ascertained or ascertained? Ascertained. Can they be definitely – here's how much business we lost, and we would have an adequate remedy at law of money damages because we know how much business we lost. And I'm just – you know, it would have been helpful with more detail on the findings. But I'm just wondering, do you think that your damages could be ascertained or determined with some definiteness? Well, we'll certainly seek damages, money damages, but they are hard to establish. It's a common problem in an unfair competition kind of a case because you can never reset the clock. What would have happened had these people not been told these false statements? Had we been given a chance to honestly compete for this business? Had these people not left us the way they did? And the defendants, by the way, well, I suppose they had a right to do it. One just left the keys in the truck and walked off the job, and the other left a note in his truck and walked off the job. I mean this was not a graceful or normal kind of exit. And so we can't go back to what it would have been like had that not been the case. So all we can really do is guess. And that's why, Your Honor, that's why the courts permit, I believe, and that's why we're seeking an order to say you've got to stop this. You've got to step back. You can't do business with these people that you lied about us to. Let's stop this bleeding. Let's have the trial. Let's figure out what happens, and then let's let the court after the trial decide what's going to happen going forward. We also believe, Your Honor, that what they said about us amounts to commercial disparagement. I know you're going to hear that commercial disparagement means you've got to say something false or demeaning about our products. And so they didn't say, well, you do a bad job of servicing these pumps, and if that's not true, then that's commercial disparagement, as opposed to they're not going to service these pumps. I believe that in this situation there's no real difference. Saying, you know, we don't have pumps that work or our pumps don't work is no different than saying we won't provide you with pumps. They told our customers and our suppliers that we were not in this business anymore. That's not true. And that false statement hurt our business, and we believe that that gives rise to a claim for commercial disparagement. And we can see that's a closer call than the Deceptive Trade Practices Act claim or the Breach of Fiduciary Duty claim. But that still is, you know, I believe, a viable claim. Next, the contract. So Bluski had a contract not to hire our non-clerical employees for a year, which really is a limited non-compete when you think about it, because if they're non-clerical employees, they're likely going to be working in the same industry. So he can work in the same industry, but he can't go after these customers for a year. Just a limitation on what he can do to compete. We believe that's valid and enforceable under Illinois law and ought to be recognized by the court. And our last claim is the Trade Secrets Act claim. And we focus on this really because of the combination of factors here. They're going after stuff that they bid on when they work for us. They're hiring employees they're not supposed to hire. They lie to customers. They lie to suppliers. Frankly, the plaintiffs don't trust the defendants, and the defendants were in possession of significant trade secret information, and that gives us a lot of concern. At the very least, they should be required to be ordered to give back every single thing that they have that could come close to being a trade secret. But I think that, frankly, the evidence in this case merits a further order preventing them from working in a situation where it's really, frankly, especially under these facts, inevitable they're going to use or disclose these trade secrets. Refresh my memory on what specifically those are. What are trade secrets that you're most concerned about? Well, they know stuff. They know things, no question, in their heads that would rise the level of trade secrets. But they had in their possession, in the possession of one of their employees, pricing lists and information from a bid that they had submitted while the group worked at Heartland. That was the same project that they subsequently bid on after they started C&C. So it's that kind of trade secret information that concerns us. Thank you. Thank you. Ellie. Good morning, Your Honors. My name is Stacey Newton, and I represent the defendants, athletes in this case, Chris Sabluski, Craig Rouse, and C&C Pump Supply. I was asked by some of my colleagues why I was coming here today. Why are you going to argue in front of the Court of Appeals? My first impulse is to say, you know what, I'm going to argue about a non-compete agreement. But guess what? There's no non-compete agreement in this case. There's also no real non-solicit agreement in this case. There's no non-solicitation of customers agreement in this case. There's no non-solicitation of suppliers agreement in this case. What we have in this case is a new employer who forgot to have some of its employees sign non-competes, admittedly forgot to have this done. That's some of the testimony that was presented at our hearing. And is now trying to create a non-compete and a non-solicitation by piecemealing together some Illinois torts, none of which can actually show it was entitled to a preliminary injunction on. Injunctive relief is an extraordinary remedy. It's available only when there's an extreme emergency and there's a threat of serious harm. Our judge in this case did not abuse her discretion. We're not talking about a motion to dismiss. We had a hearing. There was evidence. She was allowed to weigh that evidence. She was allowed to look at what the testimony was. She was allowed to decide who she believed and who she didn't believe. And she decided at the end of the day that the plaintiffs had not met their burden on this case, that they had not established a protectable interest. They had not shown that they had an inadequate remedy at law and that they had not established a likelihood of success on the merits. Just a little bit of background that I think is helpful. Mr. Rouse and Mr. Cebulski had worked for seven, I think it was seven years for one and eight years for the other, at Heartland as outside salespeople out of their office in Carterville, Illinois. At a certain point, a big corporation, Zylum, came in and decided that it was going to purchase Heartland. After that happened, as sometimes does happen in these matters, Mr. Rouse and Mr. Cebulski weren't happy there anymore, along with many other employees that were not happy there anymore because of changes in management and changes in the administration. So about two and a half months before my clients resigned, they started discussing forming their own pump sales company. And when they did that, they did talk to customers. They did talk to suppliers. But what was said is not what has been stated to you today. The actual evidence of what was said by Mr. Cebulski was just that he felt that Heartland was going in a different direction. Now, if that's not opinion and that's not just a generalized statement, I don't know what it is, that's not a statement of fact. That's a statement of Mr. Cebulski's opinion. It's amorphous, and it's something that he's entitled to be able to say. It's not commercial disparagement. Commercial disparagement requires both that there be a comment about the actual quality of the product and also that statements of opinion can't be used to make a case of commercial disparagement. Illinois law affords competitors the privilege, it's called the privilege of competition, to make statements of opinion regarding competitors to divert business from one's competitors generally as well as from one's particular competitors, providing the intent is at least in part to further their own business and not motivate it purely by spite or ill will, which we don't have evidence in this case. We have evidence that the goal in talking to customers was to get their business, admittedly so. But what was said does not constitute commercial disparagement. Mr. Ross did not say, and I think what was stated to you today, was that Kirtland wouldn't distribute products. He didn't say that to suppliers. He says they're going in a different direction. What does that mean? Exactly. What does that mean? They were selling products and servicing products, so a different direction would be something different than they weren't going to sell them or they weren't going to service them maybe, or they were going to service them differently. What are you saying? What I'm saying is just by saying that, you're right. It's amorphous. It's not a statement of fact. So he didn't say they were going in a different direction. No, they said that he felt they were going in a different direction, and he's entitled to be able to say that. What he can't say are facts that aren't true. And the basis, they had basis, and maybe this is what we need to get into now. There was basis for their opinion that Harlan was going in a different direction. The basis for that opinion, Mr. Ross had two conversations, one with a Xylem corporate trainer who was sent down to train them, who told him that now Harlan was going to focus on the sale and rental of Godwin pumps. Prior to that, they had sold an assortment of pumps and had rented an assortment of different manufacturers of pumps. Xylem not only owns Harlan, it also owns at least three different pump manufacturers, Godwin, Flight, and Gould. And those are competitor brands to brands that Harlan had been selling and renting previously. Another basis was a conversation that Mr. Ross had with Mr. Albaugh, who was, I think his, I can't remember if it was a regional or a district manager, because after he had talked to this corporate trainer, he was like, wait a minute, I want to make sure I understand what's going on. You know, are we going to change? And what he was told was, we're now going to be a Godwin branch, like any other Godwin branch, and we're going to focus on the sales and rental of Godwin pumps. So this wasn't something that Mr. Ross, their opinion was not based on nothing. The other thing is Mr. Ross had previously worked for another Godwin branch elsewhere, so he had that background as well. And he knows what a Godwin branch does. It doesn't do what Harlan had done. And so this is the basis for their opinions. And they are entitled to be able to say those things, because that's the nature of Illinois law. It encourages fair competition. I want to talk really briefly about the fiduciary duty claim. The main case that the appellants cite is the FoodCom case. That case is different than this case. FoodCom involved a higher standard of fiduciary duty. It involved a standard of an officer or director of the corporation. That's an entirely different standard than what an employee owes to a company. An employee doesn't owe the same standard of fiduciary loyalty to its employer. It's a lower standard. Regardless, merely making those statements and having formulated, you know, we're going to start our own business doesn't mean that they've reached their fiduciary duty. The fiduciary duty cases where there's been found a breach involve someone outright lying to their employer. I think it was FoodCom, actually, where you had an employee who told his employer, you know what, I'm going to smooth over your relationship with this customer. I'm going to make sure it's all good, while at the same time going around their back and saying, you know what, let's do some business together, let's do some business. And that's not what my clients were doing. When they talked to suppliers prior to leaving their employment, they said, hey, what would you think if we started our own company? That was the question. It wasn't posed in, hey, you know what, will you please, you know, let us be your sole, you know, seller of your products. And that's another thing to point out. Although we talk in these terms of suppliers and customers, that's what the accountants want you to do, the evidence was there's only one supplier of pumps that sees doing business with Heartland, and that was Stancor. And they actually sent over a letter to Stancor explaining or sent over a letter to Heartland explaining why they didn't want to do business with them. And that's because they felt that the pump sales had slowed down, they weren't selling enough. So there was no evidence that was brought in from Stancor or otherwise to say that what Stancor's reason was for stopping doing business was incorrect. There's only one customer that they can claim has ceased doing business, and that's American Coal. This business of selling and renting pumps is a bid-based business. It's not like there's just Heartland and there's just CNC. There are a multitude of different companies that do this and that present bids to customers to say, hey, can you send me a bid on getting me this pump? Can you send me a bid on renting me this kind of pump? And they get that from multiple companies, and those multiple companies send in bids, and whoever, you know, assumedly has the best bid, whether it be that it's got the best content or it's the cheapest, that's who gets the job. Not just two, it could be four, five, ten. Absolutely, absolutely, and that's what the evidence was at the hearing. There are multiple. And at the hearing for the preliminary injunction, were there any of these customers or plaintiffs that were witnesses or was the evidence based upon the admissions of what your client said? Here's what we said to plaintiff's customers. No customers were brought in to testify. No customers and no supplier representatives. It was representatives of CNC and it was representatives of Parliament's item. And as I understood Mr. Fisher's argument, he said that your client said at some point to their customers, the plaintiff is not going to be doing this business anymore. Do you think the record supports that? That's not what they said. So, no, I don't think that's what the record supports. What the record supports is there was the comment of I think they're going in a different direction and, you know, that they believe that they would be transitioning into renting and selling a specific brand of pump. Those were the comments that were made, not that's the evidence that was in the record were those type of comments. Shifting to the trade secrets argument, whether or not my client said, you know what, you're right, your pump shouldn't have this stuff. I think we need to look at what the evidence actually was. My clients didn't take anything with them when they left Hartland. They left the computers. They didn't download anything. They left their phones. They left, you know, any kind of pricing guide, any hard copy things that they had. There's no evidence that they took anything. This isn't a case where we've got, you know, downloading customer lists or any sneaky kind of stuff like that. We don't have that. They left it. They left it there. They left a hard drive there and a safe for them and said, you know, we don't need your stuff, you know, to be able to do our own business. And really there wouldn't be any reason to have it is what the testimony was. And what we did find in the course of discovery is I asked my clients, and this is in the record, to please go back. And if you have anything that's got Hartland name on it, get it to me. And in the course of that they spoke to one of their employees who was a former Hartland employee, Mr. Marvin Abbey, and he said, you know what, I'm going to check my computer at home. And he had some certain archived documents on his computer at home that he had been encouraged, and the testimony was he had been encouraged while he was at Hartland to work out of the house. So, you know, this wasn't wrong for him to have them on his home computer. So there was no testimony that C&C itself had them, that my clients had these documents in their possession, or that anybody had used these documents. And the documents themselves are pretty innocuous. We have a 2007 pricing guide, and some of the evidence that was given, some of the testimony, you can't extrapolate that into what the current prices are. And actually the current prices, the testimony was, are in a special computer program called rental rates that Xylem implemented when it took over Hartland. And my clients weren't even trained to use that, let alone could they download, they didn't download any information over that. So they didn't have any current pricing information. Regardless, there was also testimony that a pricing guide, those pricing guides were actually given to customers. So this is a secret. These are given to customers so that customers could call up the inside salespeople and say, you know what, I need, you know, X videos for X pump. I understand they're cost X amount. Please put in an order for me. And that's what they would use to order some of their parts. So these pricing guides were given out to customers, and that was part of the testimony that was at the trial. Another thing was a quote from January of 2013, and I can't recall to what, maybe Sugar Can't Buy, for a project that Mr. Sapusky himself had worked on that Marvin Abbey had written up the paperwork for. And that was a quote that was given to Sugar Can't Energy. So, again, it's not a trade secret. It's something that's given to a third party. It's not something that's limited to the business. And there were no client, there were no customer lists that were found in my client's possession. We don't have that situation. And I think the only other, there were some OSHA documents. There were some notes that Mr. Abbey had written down about complaints about the non-smoking policy being broken. And there were some pricing guides from BGM, who is a pump manufacturer, and also some, which is something that BGM created and hands out to all sorts of different sellers of pumps. And there was also some Godwin product brochures that admittedly by the appellants were not trade secret. The only thing that was left, I think, is a employee contact list, which the testimony was that's public information and could have been gotten otherwise. And Mr. Abbey knew these people and had their numbers and had that information anyway. So those are the big trade secrets that we're talking about. They aren't trade secrets. They're not confidential. And they aren't entitled to any kind of protection. Whether or not my clients thought, you know what, we probably shouldn't have had this is irrelevant. They can say that at trial. They can say, you know what, this isn't ours. We shouldn't have it. But that doesn't mean that it's entitled to protection under the law. With regards to the non-solicit of employees agreement that Mr. Sabluski had entered into, which was a bonus agreement, not only did it say that he could not hire clerical employees, but it also allowed, there was an exception for employees that answered an advertisement, a public advertisement that was not specifically directed at Heartland employees. Now, what happened after C&C Pumps opened is they hired two of the employees that they hired that used to work at Heartland were admitted by Heartland to have been clerical. The other two employees, the only evidence at trial, two other employees, the inside salespeople that were hired, the only evidence at trial as to what they did would have considered their jobs to be clerical. They answered the phones. They took orders. And they provided the orders to the fulfillment department for them to be able to fill. We're not talking about other outside salespeople. The other three employees that were hired were mechanics. And all three of those mechanics were hired, and this is the only testimony, were hired in response to an ad that was placed in the Southern Illinois newspaper which asked for pump mechanics. It didn't say anything that would be specific to Heartland. So all of the employees that were hired by Heartland were hired fair and square under this agreement. This isn't an agreement that said you absolutely cannot hire any employees at Heartland. Who testified as to that point, the employees that were hired or your clients? My clients. And also, no, it was my clients, but it was uncontroverted by the clients who were asking for the injunction. That they responded to the ads that they gave. And there's a copy of the ad that was admitted into evidence as well. Sure. So that is in your folder of exhibits. So just to summarize, this is a case where our judge had the opportunity to listen to everyone, to hear the actual evidence. The evidence is very, in these kind of cases, is very fact sensitive. And she had the opportunity to observe the witnesses, to listen to the facts that were presented to her. If you can get away from these broad generalizations that the appellants are making in this case, you can see that really they did not meet their burden for the purposes of a preliminary injunction. They simply didn't meet it. They didn't meet their burden of showing that they had a reasonable likelihood of success in the merits. They didn't meet their burden of showing that they had an inadequate remedy at law. They actually presented testimony of what they believe their damages to be thus far. And they did not establish that they had a protectable interest. So there was no abuse of discretion in this case, and the preliminary injunction was properly denied. Thank you. Thank you. Rebuttal. Rebuttal. Yes, thank you. I want to just direct the court's attention to a few pieces of testimony that I think are very important, because that's why we have transcripts. You don't have to take my word for it or opposing counsel's word for it. This is Mr. Rolfe's. This is on page 75, lines 11 to 17, Mr. Rolfe submitting that he told Mr. Emmerling, who was at BJM Pumps, that Hartland was going to drop their pumps. He said, eventually, yes, I felt that way. Next page. I'm sorry, page 77, starting at line 8. I ask, now, the statement that Hartland was going to drop Stancord, BJM, and Hydroflow wasn't based on information you found in any document that you ever saw, right? Correct. And it wasn't based on anything that anyone at Hartland had told you, right? Correct. Then, so that's with respect to suppliers. With respect to customers, Mr. Sabluski said, question, page 121, starting on line 8, line 3, you were aware that other people on behalf of CNC told customers that Hartland was going out of the full service business? Answer, yes. You agree that it was wrong to do that? Answer, yes. With respect to this trainer who supposedly gave them the idea they were going out of business, Mr. Sabluski, starting 115 at 6, no one ever told you that Godwin was getting out of the full service business. Isn't that right? No one from Godwin did? No. And then I said, no or yes. And he said, I'm sorry, no one ever told you that Hartland was getting out of the full service business, right? Yes. All right, instead you were focusing on this trainer, a corporate trainer who had been there, and his job was to train you how to rent Godwin Pumps, right, to enhance that, yes. And he said, go out and focus on rentals, right? Yes. This continues on to 116. And then he said, testifies, that was similar to what the former owner of Hartland told him. Go out and run, and he said, go rent pumps, right? And actually, as a commission salesman, that was where he made most of our money, on rentals. Okay, so you don't think when Mr. Payne said go rent pumps, that meant that Hartland was getting out of the rest of its business, did you? No. And this continues on to 117, line 8. Starting on line 2, so for someone to say focus on pump rentals, that doesn't mean do nothing else, does it? Correct. And Mr. Albaugh never told you that focusing on pump rentals meant you should drop other things, right? Right. And you knew that there was other work to do besides pump rentals, right? Yes. So that's with respect to how they somehow got confused that they're going out of business because somebody told them to go rent pumps. The agreement, you heard that the agreement had an exception for employees who respond to ads. That's true, although the exception is limited so long as you do not specific target such employees. They stack their whole business with CNC, with Hartland employees. They were targeting employees and they didn't just respond to ads, they talked to the people before they left Hartland. Finally, with respect to food comp, food comp involves sales representatives. The court talks about a heightened fiduciary duty for officers and directors and the like and said that, you know, in some cases when they leave, even if they don't have a non-compete, they can't go after business that they did while they were, had that fiduciary position with their former employer. But they said because these folks in food comp had essentially lifted this business and taken advantage of business opportunities that were given to them by their former employer, they took advantage of those and moved them to this new company, that was actionable just as if they had this higher standard of burden, higher burden. So food comp, we think, is on all fours with this. There is no higher standard applied to sales folks just as these were sales folks. I mean, what they did was wrong and it should be stopped, as the Illinois Supreme Court said. The privilege to compete does not, however, encompass the use of improper competitive strategies that employ fraud, deceit, intimidation, or other or deliberate disparagement. That's Imperial Apparel versus Cosmos Designer Direct, cited in our brief. Thank you very much, McCoy. Thank you, guys. In case we've taken under advisement, you're excused.